**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-20 (TNM)** |
| **RYAN SWOOPE** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ryan Swoope to 57 months' incarceration, at the midpoint of the advisory Guideline range as calculated by the government, 36 months' supervised release, a mandatory assessment of $100, and the agreed-upon restitution in the amount of $2,000.

## I.      INTRODUCTION

The defendant, Ryan Swoope, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Swoope pleaded guilty to one count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1). A sentence of 57 months' incarceration in this case is appropriate because Swoope (1) assaulted a United States Capitol Police sergeant by spraying him in the face with a chemical irritant, (2) did so while the sergeant wore no form of protection against the irritant, and (3) blinded the sergeant for approximately 20 minutes as a result of the assault. In addition to the assault, Swoope breached the U.S. Capitol despite clear signs that a riot was unfolding and that he was not allowed to be there, including sirens, broken glass, and police officers building a barricade with destroyed furniture. A 57-month sentence reflects the gravity of Swoope's conduct, which caused acute and prolonged pain to a defenseless police officer.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 74, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Ryan Swoope's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Swoope and his two codefendants, Saul Llamas and Jordan Siemers, traveled to Washington, D.C., from their home in Ohio to attend President Trump's rally near the Ellipse. After the rally, they walked to the Capitol with a large crowd of people. When Swoope arrived at the Capitol Grounds, he and the others used the staircase covered by the inaugural

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

scaffolding to access the Upper Northwest Terrace. From there, he entered the Senate Wing Door

with Llamas and Siemers at 3:08 p.m. Figure 1.



*Figure 1: Swoope (circled in red) entering the U.S. Capitol*

After walking over broken glass and ignoring a piercing alarm, *see* Gov't Ex. 1, Swoope

proceeded into the Senate Spouses' Lobby. While there, Swoope participated in a "Whose House?

Our House!" call-and-response before proceeding back to the Senate Wing Door lobby. Figure 2;

Gov't Ex. 2. In the lobby, Swoope watched officers creating a barricade to seal off a broken

window before exiting the building at 3:17 p.m. Figure 3.



*Figure 2: Swoope (circled in red) chanting "Our House" while in the Senate Spouses' Lobby*



*Figure 3: Swoope (circled in red) watching police officers use furniture as a barricade*

Swoope then moved to the north side of the U.S. Capitol where he encountered several United States Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers guarding the North Door to prevent rioters from making another breach of the building. Among the officers was USCP Sergeant A.B. who stood just inside the doors while other officers stood outside.[2] As some of the officers retreated to safety inside the Capitol Building, Sergeant A.B.

---

[2] The area where Sergeant A.B. stood consists of a small, enclosed vestibule. Video of the vestibule indicates that the space is just a few feet across and a few feet deep. *See* Gov't Ex. 3 at

held the door open for them. Figure 4. On their way into the building, the officers carried bicycle racks with them and away from the rioters. Gov't Exs. 3 at 1:14; 6 at 0:03-0:11. Then, as rioters overcame the remaining officers, Sergeant A.B. stayed by the doors to keep them open for the officers. *Id.* at 1:40. Once the officers were inside, one officer tried to pull the door shut while Sergeant A.B. attempted to activate the doors' electronic lock at a nearby panel. Figure 5; Gov't Ex. 4 at 0:07-0:14. As this happened, at least one rioter threw an object at the officers. *Id.* at 0:08. Notably, although most of the officers at this location were wearing riot gear, helmets, respirators, and face shields, *see e.g.*, *id.* at 0:00-0:08, Sergeant A.B. only had a baseball cap on his head, Figure 5. Nonetheless, Sergeant A.B. remained by the doors even as the situation became violent.



*Figure 4: Sergeant A.B. (circled in blue) holding a door open for retreating officers*

---

1:05-1:09. Thus, any gaseous substance sprayed into this space would have little area in which to disperse.



*Figure 5: Sergeant A.B. (circled in blue) attempting to enable the doors' electronic lock*

Among the rioters just outside these doors was Swoope. As the rioters outside of the North Door surged towards the officers, Swoope moved towards the front of the mob. Gov't Ex. 5 at 0:00-0:14; Figure 6. After observing the officers for a few moments, Swoope raised a large cannister in his hand and deployed two bursts of an orange chemical irritant at Sergeant A.B. Gov't Ex. 5 at 0:18; Figure 7. When the two bursts struck Sergeant A.B. in the face, he quickly turned away. Gov't Ex. 3 at 1:50-1:52; Figure 8. After remaining by the doors for a few more moments, Sergeant A.B. retreated into the Capitol to seek medical aid to treat the pain caused by the chemical irritant.[3]

---

[3] In an interview conducted in August 2023, Sergeant A.B. reported to the FBI that he believes that shortly after Swoope's assault, he was struck by another, more direct stream of irritant from a different rioter. However, both body worn camera and open source video only show the two bursts of spray from Swoope shot towards Sergeant A.B. While these videos do show a separate stream after the spray deployed by Swoope, the stream appears to originate from inside the Capitol and did not strike Sergeant A.B. *See* Gov't Exs. 4 at 0:20; 5 at 0:21.



*Figure 6: Swoope (circled in red) looking into the North Door entrance shortly after the officers' retreat*



*Figure 7: Swoope (circled in red) deploying chemical irritant against Sergeant A.B.*



*Figure 8: Sergeant A.B. (circled in blue) turning away from rioters after being struck by Swoope's chemical irritant spray, which is visible in the air above Sergeant A.B.*

Once inside the Capitol, Sergeant A.B. began coughing. Gov't Ex. 4 at 0:25-0:30. He was then escorted into a bathroom by another officer who grabbed onto Sergeant A.B.'s arm after noticing him in visible distress. Gov't Ex. 6 at 0:52-0:59. While in the bathroom, Sergeant A.B. tried to find a way to clean off the irritant, but he couldn't open his eyes from the pain. Figure 9; Gov't Ex. 4 at 1:04-1:15. Sergeant A.B. then briefly left the bathroom to seek aid before returning to have another officer pour a five-gallon drinking water container over his face to remove the irritant. Figure 10; Gov't Exs. 4 at 4:10-4:20; 7 at 0:00-0:10.



*Figure 9: Sergeant A.B. winces and audibly groans from the chemical irritant*



*Figure 10: A USCP officer pouring water on Sergeant A.B. (circled in blue) to remove the irritant from his eyes*

In a subsequent interview, Sergeant A.B. described his symptoms from the chemical irritant to include temporary blindness, trouble opening his eyes, and stinging. Sergeant A.B. also reported that he needed "gallons" of water to decontaminate his face from the irritant and that it took

approximately 20 minutes for him to fully open his eyes again.

### III.   THE CHARGES AND PLEA AGREEMENT

On August 30, 2023, a federal grand jury returned a superseding indictment charging Swoope with eight counts, including assaulting, resisting, or impeding certain officers with a dangerous weapon or inflicting bodily injury, in violation of 18 U.S.C. § 111(a)(1) and (b). On October 5, 2023, Swoope was convicted of the lesser included offense of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1), based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

Swoope now faces sentencing on one count of assaulting, resisting, or impeding certain officers. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Probation Officer's guidelines calculations resulting in a total offense level of 24 and a criminal history category of I. PSR ¶¶ 49, 53. Further, the government asserts that Swoope is not entitled to any reduction under the newly enacted U.S.S.G. §4C1.1 Guideline because he used violence in connection with the offense and he has one criminal history point. PSR ¶ 51; U.S.S.G. §4C1.1(a)(1), (3).

### a. Bodily Injury Specific Offense Characteristic Pursuant to U.S.S.G. §2A2.2(b)(3)(A)[4]

The PSR correctly recommends increasing Swoope's offense level because Sergeant A.B. suffered a bodily injury as a result of Swoope's actions. Under the Guidelines, a bodily injury is "any significant injury; *e.g.*, an injury that is painful an obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. §1B1.1, n.1(B). Spraying a defenseless person directly in the face with chemical irritant can qualify as a bodily injury. *See United States v. Douglas*, 957 F.3d 602, 607-08 (5th Cir. 2020) (per curiam). In the January 6 context, several judges have found that chemical irritants can cause bodily injury for the purposes of Guidelines calculations. *See United States v. Gieswein*, 21-cr-24 (TNM) (applying U.S.S.G. §2A2.2(b)(3)(A) where the victim-officer experienced a burning sensation and irritation as well as coughing following exposure to the defendant's chemical irritant spray); *United States v. Ramey*, 22-cr-184 (DLF) (applying the bodily injury specific offense characteristic where the victim-officers reported disorientation and vision impairment from the defendant's chemical irritant spray); *United States v. Khater*, 21-cr-222 (TFH) (finding a bodily injury where the defendant's spray caused three police officers to retreat from a police line after the spray struck their faces); *United States v. Caldwell*, 21-cr-181 (CKK) (applying U.S.S.G. §2A2.2(b)(3)(A) where the defendant's spray caused vision impairment, respiratory difficulties, pain, vision impairment, and skin irritation).

Here, Swoope caused bodily injury to Sergeant A.B—an injury that was both painful and obvious. Sergeant A.B. expressly stated that he was in "stinging" pain from the chemical irritant. Immediately after Swoope struck Sergeant A.B. with the irritant, the sergeant turned his face away

---

[4] Pursuant to the plea agreement, this specific offense characteristic is the only Guideline in dispute by the parties.

from the source of the irritant in pain and away from the violent mob to shield himself from any further assault. Although he remained at his post for a few moments, Sergeant A.B. quickly had to retreat into the Capitol to seek aid. He spent the next 20 minutes unable to fully see while other officers poured water over his face. In the meantime, Sergeant A.B. winced and groaned in pain as well as experienced respiratory distress in the form of coughing. These symptoms and reactions to the spray demonstrate that Swoope caused a bodily injury to Sergeant A.B. Therefore, the Court should apply the appropriate specific offense characteristic under U.S.S.G. §2A2.2(b)(3)(A).

While it is true that Sergeant A.B. reported that he was struck by a second spray of irritant shortly after Swoope's assault, the video evidence does not depict it. Indeed, the only spray originating from the direction of the rioters depicted on the video are the two bursts that Swoope deployed. Further, even if the Court does find that another rioter also sprayed Sergeant A.B., this fact would not preclude a finding that Swoope caused a bodily injury. If there were two rioters, the cumulative effect of their sprays resulted in the painful and obvious injury suffered by Sergeant A.B., and, at the very least, Sergeant A.B. was injured more badly than he otherwise would have been because of Swoope's assault. *Cf. Burrage v. United States*, 571 U.S. 204, 211, 214 (2014) (stating that sufficient evidence of causation exists where "the predicate act combines with other factors to produce the result" or where "multiple sufficient causes independently, but concurrently, produce a result"). The evidence is sufficient to find, especially under the applicable preponderance of the evidence standard, that Swoope caused a bodily injury. *See United States v. Dorcely*, 454 F.3d 366, 372-373 (D.C. Cir. 2006) (noting that the applicable standard for relevant conduct at sentencing is preponderance of the evidence).

The U.S. Probation Office calculated Swoope's criminal history as category I, which is not disputed. PSR ¶ 53. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, of 24, Swoope's Guidelines imprisonment range is 51 to 63 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Swoope's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. After entering the U.S. Capitol through the Senate Wing Door breach, Swoope participated in a "Whose House? Our House!" call and response. Swoope then proceeded to the North Door of the building where he sprayed chemical irritant into the face of a USCP sergeant. As a result, the sergeant, who at the time was trying to get other law enforcement officers to safety, retreated into the Capitol where he spent the next 20 minutes blinded by the irritant. The nature and circumstances of Swoope's offense were of the utmost seriousness, and fully support the government's recommended sentence of 57 months' incarceration.

### B.  The History and Characteristics of the Defendant

Swoope has had interactions with law enforcement in the past. Most recently, in 2019, Swoope was convicted of possessing marijuana and possessing marijuana paraphernalia—a conviction for which he received a fine. PSR ¶ 51. An earlier police contact did not result in a

criminal conviction. PSR ¶ 55.

Of note, in an interview with the FBI, Swoope's co-defendant, Saul Llamas, described Swoope as "incredibly smart." Swoope's intelligence is, if anything, an aggravating factor. Swoope is someone who should have known better than to commit the assault against Sergeant A.B. There is nothing about Swoope's history or characteristics that merit a sentence below the applicable guidelines range.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Swoope's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a substantial term of incarceration. At the time of the assault, Sergeant A.B. was not actively engaging with rioters in any way. He was simply allowing his fellow officers

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

to retreat into Capitol for safety. After those officers had successfully retreated, Sergeant A.B. tried

to shut the door to prevent another breach of the Capitol. At no point in this moment did Sergeant

A.B. attempt to do anything to the rioters. Rather, he just wanted to close the door. Swoope,

however, responded to the sergeant's efforts by spraying chemical irritant directly at the sergeant's

face. There was nothing happening at that moment that could be remotely construed to justify

assaulting the sergeant. This type of unjustifiable and unprompted violence is highly aggravating

and is the exact type of behavior that must be specifically deterred.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United

States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by

professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Robert Gieswein*, 21-cr-24 (TNM), the defendant and other rioters breached through a line of officers protecting the stairs to the Upper Northwest Terrace. As those rioters did so, Gieswein sprayed the officers with a chemical irritant. Gieswein then sprayed police officers a second time as he was approaching the Capitol. There is no evidence that the officers suffered bodily injury as a result Gieswein's first two sprays. Gieswein entered the Capitol and, at the Capitol Visitor Center, encountered several officers attempting to arresting another rioter. In response, Gieswein sprayed two of the officers in the eyes, this time causing bodily injury that halted the officers efforts to arrest the rioter. However, there was no indication that any officers' symptoms lasted as long as Sergeant A.B.'s did. In addition, as part of the plea negotiations, the parties agreed to not apply the dangerous weapon enhancement under U.S.S.G. §2A2.2(b)(2)(B). As sentencing on two counts of assaulting, resisting, or impeding certain officers, this Court sentenced the defendant to 48 months' incarceration, 36 months' supervised release, and $2,000 in restitution.

A similar sentence is warranted here. While Gieswein sprayed more officers, Swoope's assault on Sergeant A.B., an unprotected officer in a small, enclosed area, caused more serious injury than Gieswein's. Thus, a similar but somewhat longer sentence here is appropriate.

This Court may also consider, for reference, the sentence imposed in *United States v. Julian Khater*, 21-cr-22 (TFH). Once on the West Front of the Capitol, Khater moved towards the police line at the base of the inaugural stage where rioters were violently attempting to breach the line. As he approached, Khater indicated that he had been sprayed with chemical irritant by the police officers. In response, Khater retrieved a can of pepper spray from his bag, and after spending several minutes away from the officers, returned to the police line and sprayed at least three police

officers. Khater sprayed officers for approximately 30 seconds before a USCP lieutenant responded by spraying Khater with chemical irritant. As a result of Khater's spray, the three officers were forced to retreat from the police line to seek aid. Like Sergeant A.B., one of the officers spent approximately 20 minutes decontaminating his face of the irritant by pouring water over his eyes.[8] Another officer harmed by the defendant, like Sergeant A.B., had no helmet or eyewear to protect against the spray. After the defendant assaulted her, she lost her ability to see and required assistance from another officer to escape to safety. At sentencing on one count of assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, the court sentenced Khater to 80 months' incarceration, 24 months' supervised release, a $10,000 fine, and $2,000 in restitution.

A comparable sentence is warranted here. Although Khater's conduct is more serious in that Khater assaulted multiple officers, Khater and Swoope both assaulted unprotected officers and caused painful injuries that debilitated officers for approximately 20 minutes. And Swoope's conduct is worse than Khater's in the sense that Swoope was inside the Capitol. So a similar, if commensurably shorter, sentence is warranted in this case.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

---

[8] As the Court is likely aware, this officer was Officer Sicknick who died on January 7 after suffering two strokes after the riot. Although the defendant's chemical irritant spray was not the direct cause of Officer Sicknick's death, the Office of the Chief Medical Examiner for the District of Columbia concluded that "all that transpired [on January 6] played a role in [Officer Sicknick's] condition." 21-cr-222 (TFH), ECF No. 97 at 19. This fact underscores the seriousness of the conduct committed by Swoope and others who carelessly assaulted police officers throughout the course of the riot.

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. Although the victim in this case, Sergeant A.B., suffered bodily injury as a result of Swoope's assault, he did not incur calculable damages as a result. Nonetheless, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Swoope must pay $2,000 in restitution, which reflects in part the role Swoope played in the riot on January 6.[10] ECF No. 73 at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Swoope's restitution payment must be made to the Clerk of the Court, who will forward the

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 94.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' incarceration, 36 months' supervised release, a mandatory assessment of $100 for his felony conviction, and the agreed-upon restitution in the amount of $2,000.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Andrew Haag*
        Andrew S. Haag
        Assistant United States Attorney
        MA Bar Number 705425
        601 D Street NW
        Washington, D.C. 20530
        (202) 252-7755
        andrew.haag@usdoj.gov

        Adam M. Dreher
        Assistant United States Attorney
        Mich. Bar No. P79246
        601 D Street NW
        Washington, D.C. 20530
        (202) 252-1706
        adam.dreher@usdoj.gov